THOMAS A. MULCARE *vs.* OWEN W. WELCH.

Berkshire.    September 12, 1893. — November 1, 1893.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & LATHROP, JJ.

*Promissory Note — Parol Evidence — Agreement between original Promisor and ordinary Indorser.*

If the liability of A., who signed a promissory note on the back, is that of an original promisor, and the liability of B., who signed after A., is that of an ordinary indorser, an action by A. against B. cannot be maintained in the absence of an agreement between A. and B. that B. should assume any different liability from that which would result from his signing.

CONTRACT to recover of the defendant as co-surety, and for contribution as such co-surety, on the following note:

" $500.    North Adams, Mass., July 28, 1891.    Four months after date we promise to pay to the order of Owen W. Welch Five hundred Dollars at Berkshire National Bank.    Value received."    Signed on the face of the note, " L. Simon & Co." Indorsements on the back, " T. Mulcare, O. W. Welch."

At the trial in the Superior Court, before *Maynard*, J., one Robinson testified as follows: " At the date of the note I was one of the firm of L. Simon & Co.    L. Simon for the partnership signed the note, and I then took it to Owen W. Welch to secure his indorsement thereon. . . . I asked Welch if he would lend us his name on a note, and he declined . . . unless we could give him security. . . . He asked if we could not get some one else besides him to go on, and I suggested Mulcare; and he said in substance, ' If you can get him to go on, I 'll sign.'    I then had the note in my hand.    Immediately I went to Mulcare's place of business, and told Mulcare that Welch had declined to sign unless I got some one besides him.    I told him that I had been to Welch and asked him to indorse this note, and he had declined unless I got some one else besides him to go on.    I told him I suggested you to Welch, and he said, ' All right, if you can get him to sign I 'll sign.'    Mulcare then signed.    I then took the note back to Welch and he signed; and my firm had it discounted at the Berkshire National Bank.    After Welch had

signed the note I gave him another note payable to his order and signed by our firm for $1,000, to be held by him, and out of which he was to reimburse himself for any sums he might be obliged to pay on account of signing the note in suit. We owed Welch nothing at the time. Before maturity of the note in suit, our firm was petitioned into insolvency, and the estate of the partnership of L. Simon & Co. distributed according to law, and paid about forty-nine cents on the dollar. Directly after Mulcare signed the note in suit, I gave him the firm note for $500, payable to his order, out of which he was to pay himself for any sums he might be obliged to pay on account of signing the note in suit, and for no other purpose."

On cross-examination he testified: "My attention was first directed to the conversation I had with Welch in reference to signing the note after this suit of Mulcare against Welch was brought. I can't give the language word for word used by Welch, but I know the import of it. I took the note to Welch signed by L. Simon & Co., and without Mulcare's indorsement, and asked Welch to sign it. He objected to signing it unless I got a good name on the note besides him, or gave him security on the stock; and I told him that we should not give security on the stock, as it would be published in the mercantile paper. I told him that I thought I could get Mulcare to sign the note, and Welch said, 'If you get Mulcare's name, or bring me that note with Mulcare's name on it, I'll sign it'; that is about my understanding of it. After this conversation with Welch, I went to Mulcare and told him that I had been to Welch and asked him to sign the note, and Welch had refused unless our firm would give him security, or get a good name on the note; that I suggested his, Mulcare's name, and that Welch had said that, if I would bring him the note with Mulcare's name on it, he would sign; that is as I think it was. The words I used to Mulcare were, 'If he'll sign, I'll go on with him.' Welch told me he would go on with Mulcare; Welch did not tell me he would be jointly responsible with Mulcare; he did not tell me to tell Mulcare that he would sign that note with Mulcare if Mulcare would be jointly responsible with him. Welch did not tell me to tell Mulcare anything. Welch understood I was going to Mulcare, but Welch did not tell me to tell Mulcare that he would be re-

sponsible on that note jointly with him ; he said he would sign with Mulcare, but Welch did not tell me to tell Mulcare that. When I suggested Mulcare's name to Welch, he said that Mulcare was good."

At the conclusion of this testimony the parties admitted that if Welch had a $1,000 note he did not prove the note in the insolvency court against the estate of L. Simon & Co.; that Mulcare did prove his $500 note, which was given to him as security payable to his order, in said insolvency court, and received $240 as the dividend thereon. No sum was allowed or paid on the original note signed by these parties in the insolvency court. The original note was held by the Berkshire National Bank, by which suit was brought against Mulcare, who paid the judgment and costs. Welch was not a party to that suit, and did not authorize Mulcare to defend.

The plaintiff testified as follows: " Henry Robinson was a friend of mine, and he came to me and said, . . . ' Will you sign this note ? ' He showed me the note, which was made payable to Welch. He said, ' It won't cost you anything, and it will do me a great favor ; we have a bill to meet at the bank.' He said to me, ' If you sign this note, Welch will sign it.' I said, ' Can't you get somebody else to sign it, I don't know anything about law.' Robinson also said, ' I took this note to Welch to sign ; you can see it is made payable to Welch. I have been over to Welch, and he would not sign it because he had some difficulty with some other notes he had signed for other people, and told me to get some one else.' Robinson also said, ' You and Tom are quite friendly, why don't you go and get him to sign.' Robinson said to Welch, ' Well, I think I can get Tom to sign it '; and he came over where I was at work. I objected to signing, but Robinson said to me, ' Why, it won't cost you anything ; you and I have always been friends ; we worked together in the Arnold Print Works ; I don't see why you would n't do me this favor.' "

*Q.* " I want to get out all Robinson said to you about Welch signing it ? "

*A.* " He said Welch said, ' Why don't you get him to sign ? if he signs it, I 'll sign it.' That is what he told me. At that I thought both were responsible. After that I signed the note."

On cross-examination the plaintiff testified: "Robinson told me that Welch said to him, 'Why don't you go and get him to sign?' meaning me, 'and if he signs it I'll sign it'; and that is as Robinson told it to me. I did not see Welch before this note was signed, and made no agreement with him that we were to be jointly responsible on that note. . . . I never had any arrangement, understanding, or agreement with Welch as to how I and he were to become parties to the note as to signing."

At the conclusion of the plaintiff's evidence, the judge directed a verdict for the defendant, at the request of his counsel; and the plaintiff alleged exceptions.

*E. H. Beer*, for the plaintiff.

*M. E. Couch*, for the defendant.

KNOWLTON, J. To the holder of the note when it first took effect as a contract, the liability of L. Simon and Company was that of makers; the liability of the plaintiff was that of an original promisor, who could be charged only by a demand and notice under the Pub. Sts. c. 77, § 15; and the liability of the defendant was that of an ordinary indorser. *Clapp* v. *Rice*, 13 Gray, 403. As between the holder and these parties, their rights and liabilities could not be varied by parol evidence. *Prescott Bank* v. *Caverly*, 7 Gray, 217.

Their relations to each other in reference to the note can be proved by parol, so as to show which was primarily liable for the payment of it, and whether the others as between themselves should be holden jointly or severally; and if severally, in what order. But nothing less than an actual agreement between them will change the liability imposed by law in consequence of the several undertakings shown by the note itself. If it were shown that they signed in a different order from that in which their names appear, it would not affect their legal relations to each other, in the absence of an agreement as to what those relations should be. *Clapp* v. *Rice*, 13 Gray, 403. *Sweet* v. *McAllister*, 4 Allen, 353. *Woodward* v. *Severance*, 7 Allen, 340. *Shaw* v. *Knox*, 98 Mass. 214. *Brown* v. *Butler*, 99 Mass. 179. *Baldwin* v. *Dow*, 130 Mass. 416. *Mansfield* v. *Edwards*, 136 Mass. 15.

The principal question in this case is whether there was any evidence tending to show an agreement to sustain relations to

each other different from those resulting from their acts in placing their signatures on the note. We are of opinion that there was not. The plaintiff testified in cross-examination as follows: "I did not see Welch before this note was signed, and made no agreement with him that we were to be jointly responsible on that note. . . . I never had any arrangement, understanding, or agreement with Welch as to how I and he were to become parties to the note as to signing." His testimony in direct examination, giving the conversation between him and Robinson in regard to the defendant's signing the note, has no tendency to show an agreement that the defendant should assume any different liability from that which would result from his signing. The only other witness on this point was Robinson, and his testimony distinctly negatives the existence of any agreement between the plaintiff and the defendant.

Inasmuch as the plaintiff's liability on the note was that of an original promisor, although chargeable only by a demand upon the other makers and a notice of their neglect to pay, while the liability of the defendant was only that of an indorser, we are of opinion that the presiding justice rightly directed a verdict for the defendant.                    *Exceptions overruled.*